**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>IGNACIO DEALBA, JR.,<br><br>                Defendant. | Case No. 2:12-cr-00079-JCM-PAL<br><br>**REPORT OF FINDINGS AND RECOMMENDATION**<br><br>(Mtn to Suppress - Dkt. #44) |

      Before the court is Defendant Ignacio DeAlba Jr.'s ("DeAlba") Motion to Suppress for Fourth Amendment Violations (Dkt. #44) which was referred to the undersigned for a Report of Findings and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule IB 1-4. The court held an evidentiary hearing on the Motion on March 12, 2013. The court has considered the Motion, the government's Response (Dkt. #49), the evidence adduced at the evidentiary hearing, and the arguments of counsel following the hearing.

**BACKGROUND**

      On March 13, 2012, the grand jury returned an Indictment (Dkt. #1), charging DeAlba with felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On March 23, 2012, DeAlba made an initial appearance, entered a not guilty plea, and was detained pending trial. *See* Minutes of Proceedings (Dkt. #9). On July 25, 2012, DeAlba filed a Motion to Suppress (Dkt. #21), seeking to suppress evidence found after a traffic stop. On September 14, 2012, the court entered a Report of Findings and Recommendation (Dkt. #32) recommending that the Motion to Suppress be denied, which the district judge affirmed in an Order (Dkt. #39) adopting the Report and Recommendation and denying the Motion to Suppress.

///

On September 18, 2012, the grand jury returned a Superceding Indictment (Dkt. #33), charging DeAlba with two counts of felon in possession of a firearm in violation 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The charges in the Superceding Indictment arise out of the July 9, 2011 search of the home of Helen Robinette, DeAlba's mother. DeAlba made an initial appearance on the Superceding Indictment on September 28, 2012, entered not guilty pleas, and was detained pending trial. *See* Minutes of Proceedings (Dkt. #36). The instant Motion to Suppress followed. Trial is set on May 15, 2013.

## DISCUSSION

### I.     The Parties' Positions.

The Motion to Suppress argues that the search of Ms. Robinette's home was an unconstitutional search. Ms. Robinette signed a written consent to search her home, however, DeAlba was physically present at the time she consented, and refused to consent to the search. DeAlba argues that his mother's consent could not override his refusal to consent, citing *Georgia v. Randolph*, 547 U.S. 103 (2006). Therefore, when the police searched his mother's home over his objection the search violated the Fourth Amendment. Alternatively, DeAlba argues that even if Ms. Robinette's consent was sufficient to allow officers to search her home, her consent was involuntary under the totality of the circumstances. DeAlba argues that the totality of the circumstances demonstrate Ms. Robinette was in custody, and confronted by armed police officers outside and inside her home who implied she could be taken into custody if she did not consent. Additionally, the officers did not advise Ms. Robinette of her right to refuse the officers to enter her home, or consent to a search of DeAlba's room. Finally, DeAlba argues that one officer told Ms. Robinette that she had to give permission to search DeAlba's room. These arguments are based on a Federal Public Defender investigator's report of Ms. Robinette's interview attached as Exhibit "B" to the motion to suppress.

DeAlba argues that he had a reasonable expectation of privacy in the room in which he was staying and therefore has standing to challenge the search. He asks that the court suppress all tangible and testimonial evidence derived from the search under the "fruit of the poisonous tree" doctrine.

The government opposes the Motion arguing that Ms. Robinette gave a valid and effective written consent to search her home, including the room occupied by DeAlba. The government

acknowledges that whether her consent was voluntary is a question of fact that depends on the totality of the circumstances. Applying the Ninth Circuit five factor test the government argues that the consent was voluntary. The written consent to search form specifically informed Ms. Robinette that she had the right not to have a search made of the premises without a search warrant, and the right to refuse consent. Officers asked Ms. Robinette for permission to search the residence, and DeAlba's room for firearms. Ms. Robinette was not under arrest or in custody at the time she signed the consent form, and the government disputes that the officers made a veiled threat of arrest to induce her to sign it. The police report DeAlba relies upon in bringing his motion to suppress indicates that Ms. Robinette stated to the officers that no one in the home should have a firearm because there were children present. The government points out that DeAlba's motion fails to address Ms. Robinette's concern about the presence of firearms which demonstrates that her consent was likely voluntary.

The government contends that Ms. Robinette's voluntary consent to search the premises was all that was needed to conduct a lawful warrantless search. Citing *United States v. Brown*, 563 F.3d 410, 418 (9th Cir. 2009) the government argues that the police had no duty to seek consent from all of the occupants, even when doing so would be convenient. As the Supreme Court pointed out in *Georgia v. Randolph*, any other rule wold turn every consent case into a test about the adequacy of efforts to consult with a potential objector.

Under *Brown*, the police may remove a co-occupant from a scene prior to his potential objection to a search so long as the primary purpose of the removal is not to avoid the objection. The government maintains that DeAlba has failed to demonstrate that he was ever asked for consent to search prior to the officers seeking consent from Ms. Robinette. The government acknowledges that the officers asked Ms. Robinette for consent and that DeAlba yelled at his mother "mommy don't do it". However, as the officers did not attempt to obtain consent from the defendant, this statement does not indicate that DeAlba was asked for consent to search. Additionally, the government argues that DeAlba's yelling at his mother not to consent is an indication he was attempting to interfere with an ongoing investigation and arguably intimidate his mother from assisting law enforcement with the investigation. Thus, the government claims that *Randolph's* holding is inapplicable to this case.

///

1    Alternatively, the government asserts that even if Ms. Robinette's consent was not voluntary, the evidence should not be suppressed because the firearm would have been inevitably discovered. The government contends that given the facts and circumstance of this case the officers could have reasonably obtained a search warrant for the room defendant claims was unlawfully searched. Before the consent was requested officers observed ammunition in the room where the firearm was subsequently located. The officers were there to locate and arrest DeAlba's girlfriend, Rachel Loyd, who had outstanding felony warrants. The officers also learned that DeAlba had outstanding felony warrants and was a convicted felon. Thus the officers' observation of ammunition in the room jointly occupied by Loyd and DeAlba provided probable cause to obtain a search warrant for the premises. As the officers would have obtained a search warrant in the absence of Ms. Robinette's consent, the firearm would have been inevitably discovered, and suppression is not an appropriate remedy.

## II.    Evidence Before the Court.

The government called Officer Mangione as a witness at the evidentiary hearing. Mangione testified that he has been employed by LVMPD for four years and is assigned to the Northeast Problem Solving Unit. On July 8, 2011 he responded to a family disturbance call and took a report. The person reporting, Andrea Loyd, said she had been in a verbal argument with her daughter Rachel, and Rachel's boyfriend "Nacho". Loyd reported that "Nacho" had threatened her and described the address where her daughter had gone to stay with "Nacho". Andrea Loyd told the officers to be careful because if they went to look for "Nacho" he was known to have a gun.

As a result of the contact with Andrea Loyd, Mangione and his partner conducted a records check which indicated Rachel Loyd had three outstanding felony warrants for her arrest. They printed out a DMV photograph of Rachel and went to the 1515 Dawley address in Las Vegas that Andrea Loyd provided. Mangione and his partner went to the address and "sat on it" to see if Rachel Loyd would come out. When she did not, the officers left.

The following day, on July 9, 2011, Mangione and his partner, Officer Root, returned to 1515 Dawley and parked on the side of the house to see if anyone would come out. Eventually they decided to do a "knock and talk" to see if Rachel Loyd was there. From the records check the officers had information that Rachel listed her address as 1515 Dawley. As they approached the house they got a

1  glimpse through a window and saw a black female and Hispanic male in one of the rooms. Officers
2  knocked on the door and Helen Robinette answered. The officers used a "ruse" and told her they had
3  received a 911 disconnect and needed to check the house. Ms. Robinette admitted the officers. She
4  told the officers that there were small children in the home and that her son and her son's girlfriend
5  were also there. Mangione proceeded down the hall to the bedroom after clearing the kitchen to make
6  sure no one was present. He then explained to Ms. Robinette that Rachel Loyd had outstanding
7  warrants. Ms. Robinette responded "oh that bitch has warrants - get her out of my house." The officers
8  opened the door to the room Robinette indicated her son and girlfriend were in and found both DeAlba
9  and Loyd sleeping. The officers woke them up and as Mangione was placing Rachel under arrest and in
10 handcuffs Mangione observed a bullet on the top of the desk adjacent to the bed.
11      As the officers were leading Rachel out of the house DeAlba followed them asking what was
12 going on. When DeAlba continued to ask questions officers asked him to identify himself and
13 conducted a records check. The records check indicated that DeAlba also had three outstanding felony
14 warrants, and that he was a convicted felon. As a result, DeAlba was placed in handcuffs.
15      Based on his observation of the bullet on the desk in the bedroom Mangione believed that a
16 firearm was in the room. Ms. Robinette came outside and was watching. Officer Mangione described
17 her as extremely cooperative. Ms. Robinette had positive attitude towards the officers. After DeAlba
18 was handcuffed Mangione and his partner asked for another marked unit because they had two suspects
19 in custody. Once Officer Stafford arrived Mangione explained the circumstances to Ms. Robinette, i.e.,
20 that her son was being arrested on outstanding warrants and that he was concerned about the possibility
21 of a firearm in her house. He asked Ms. Robinette for her consent to search the room. Robinette stated
22 that DeAlba had been staying with her off and on. After the officers learned DeAlba was not a
23 permanent resident no attempt was made to request his consent. Mangione did not ask for DeAlba's
24 consent because he concluded that DeAlba did not have standing to consent to a search of Robinette's
25 residence because he was not a permanent resident. Robinette expressed her concern about a gun being
26 in the house with small children and gave a written consent to search. The conversation requesting her
27 consent to search took place in her front yard during daylight hours.
28 / / /

Robinette's written consent to search was marked and admitted as Government's Exhibit 1. Mangione and Officer Stafford were present when she provided the written consent. Mangione did not recall if the form was read to her verbatim, but did recall that he explained that Ms. Robinette did not have to consent, and that it was her choice. Mangione also explained that the officers wanted to search for firearms. Ms. Robinette did not ask any questions.

While the officers were talking with Ms. Robinette about the consent DeAlba started to scream out "no mommy, don't." Ms. Robinette looked at Officer Mangione who told her to pay attention to the officer and not to DeAlba. Ms. Robinette did not have any objection and signed the written consent.

Mangione reentered the room and located the firearm in the drawer where he had seen the bullet. After locating the firearm Mangione conducted a "premises freeze" and called the Firearm Detail who obtained a search warrant for the premises.

On cross examination Officer Mangione testified that he did not write a written report. However, he reviewed Detective Maholick's report before testifying. He was given a copy of Ms. Robinette's statement that was attached to the Motion to Suppress and also reviewed it before testifying. He identified Defendant's proposed Exhibit A as a photograph of the residence at 1515 Dawley. The photograph shows one window. However, there are actually two. He did not recall if the window depicted in the photograph is the window through which he saw Rachel and DeAlba. He thought something was covering the window at the time he looked through and saw Rachel and DeAlba in the home. It was difficult to see into the room, but the officers were able to observe the two individuals through a crack in the covering.

Mangione did not recall whether when the officers knocked on the door Ms. Robinette was asked to come out or whether she did come out of the residence. The officers used the 911 ruse after Ms. Robinette confirmed that Rachel was in the house. After Ms. Robinette admitted the officers they told her what they were actually there for. Rachel was placed under arrest and escorted out of the home. While the officers were taking Rachel out DeAlba asked a lot of questions, mostly to Mangione's partner. DeAlba went outside the residence and after officers confirmed his identification and learned he had outstanding warrants he was arrested on the warrants. Ms. Robinette was standing outside the front yard watching.

The officers first explained to Ms. Robinette that DeAlba was being arrested on outstanding warrants. The officers clarified whether he lived in the home. Ms. Robinette said it wasn't DeAlba's room, that he was bouncing around from her house and his sister's house. Ms. Robinette also stated that she went in every day to clean the room and had full access to it. Mangione recalled that he specifically asked her if it was DeAlba's room, and Ms. Robinette stated it was not. The officers did not ask Ms. Robinette who the desk in the room belonged to.

Mangione heard the Defendant say "no, mommy, don't" referring to the consent. Mangione told Ms. Robinette that it was her choice. He did not recall whether Defendant called out to his mother not to consent before or after Ms. Robinette signed. Mangione reiterated that he did not ask DeAlba for his consent to search.

When Mangione first saw the bullet on the desk he did not know whether DeAlba was a felon. He knew Rachel had outstanding felony warrants when he first entered the room, but did not verify whether she had any felony convictions. In running her, Mangione did not see a felony registration. Felon in possession of ammunition is not a violation of Nevada law. Rather, he was aware it was a federal charge. Mangione did not recall whether there were clothing items on the desk when he saw the bullet.

Defendant's Exhibit "B" was marked and admitted. It is a photo of the gun that was recovered after Ms. Robinette gave her consent. Stafford secured the premises while waiting for a warrant. Mangione opened the drawer to the desk and saw the firearm and "backed off" because officers knew DeAlba was a convicted felon. Mangione requested Firearm Detectives to take over. Mangione did not ask who the TV in the room belonged to. He reviewed Ms. Robinette's statement and knows that she stated that the belongings and the TV in the room belong to her brother-in-law. However, Mangione did not believe he asked her who owned the belongings in the room. Mangione was not sure whether paperwork with Defendant's name was found in the room. The rest of the search was done by the other officers.

On redirect Mangione testified that he only asked for Ms. Robinette's consent to search because he did not believe that DeAlba had standing or a right to privacy because it was not his room. Rather, Ms. Robinette indicated that she allowed him to stay there. DeAlba was arrested because the officers

learned he had outstanding warrants.  On recross-examination Mangione acknowledged that he testified about this matter in state court at a preliminary hearing.  At the preliminary hearing he testified that the only search he did was for the firearm.

At the conclusion of Officer Mangione's testimony the government rested.  Counsel for Defendant also rested without presenting any evidence.  The court canvassed the Defendant about whether he had been advised of his right to testify or not.  DeAlba acknowledged that he had been so advised, and after consulting with his counsel determined it was not in his best interest to testify.  During oral argument counsel for DeAlba moved to reopen the evidentiary hearing to allow Ms. Robinette to testify concerning standing.  The court granted the request over the government's objection and Ms. Robinette was called to the stand.

Ms. Robinette testified that DeAlba is her son.  On July 8 and 9, 2011, DeAlba was staying with her off and on and had been for approximately two weeks.  Sometimes DeAlba would sleep on the couch.  Ms. Robinette's home had four bedrooms.  DeAlba first stayed in one room, and then was staying in the back room where the police officers found him sleeping.  DeAlba used the address as his permanent address and received mail there.  He also had personal belongings there.  He was allowed to stay there.  If he came over he could stay because "it's his home."

On cross-examination Ms. Robinette testified that DeAlba did not stay with her all of the time.  He also stayed with her daughter at another residence.  However, DeAlba was welcome there because he was her son.  DeAlba would always call when he wanted to come over.  Sometimes DeAlba would bring his girlfriend with him, and sometimes he wouldn't.

**II.     Applicable Law & Analysis.**

The Fourth Amendment of the Constitution secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Supreme Court has interpreted this as requiring: (a) a warrant for searches and seizures (unless an exception applies); and (b) probable cause to support the warrant.  *See United States v. Katz*, 389 U.S. 347, 357 (1967).  The Fourth Amendment protects reasonable and legitimate expectations of privacy for people, not places.  *Id.*  Evidence obtained in violation of the Fourth Amendment's

/ / /

protection, as well as evidence derived from a violation, may be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

### A.  DeAlba's Standing to Challenge the Search of The Room.

Because the Fourth Amendment protects people not places, the "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Olson*, 495 U.S. 91, 95 (1990) (citing *Katz v. United States*, 389 U.S. 347 (1967); *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)).  In order to have standing to contest the legality of a search or seizure, a defendant must establish that he had a subjective expectation of privacy in the place searched, and society must accept that expectation as objectively reasonable. *Minnesota v. Carter*, 525 U.S. 83, 87-88 (1998) (citing *Rakas*, 439 U.S. at 143-44 & n.12).  The defendant bears the burden of establishing, under the totality of the circumstances, that the search or seizure violated his legitimate expectation of privacy in a particular place. *See United States v. Davis*, 932 F.2d 752, 756 (9th Cir. 1991) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)); *see also United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993).

Where a defendant has "joint control" or "common ownership" over property, the Ninth Circuit has held this is sufficient to support a legitimate expectation of privacy. *See United States v. Thomas,* 447 F.3d 1191, 1198 (9th Cir. 2006).   The Supreme Court has also held that overnight guests have a legitimate expectation of privacy in their temporary quarters. *Minnesota v. Olson*, 495 U.S. 91, 99 (1990).  The rationale for this holding is that it is unlikely that the host of an overnight guest will admit someone who wants to see or meet with the guest over the objection of the guest. *Id*.  DeAlba asserts he had a legitimate expectation of privacy in the room in which he and his girlfriend had been staying and therefore, has standing to contest the search.  It is undisputed that he was an overnight guest in his mother's home.  The uncontroverted testimony in the record is that DeAlba had been staying in his mother's home off and on for the two weeks prior to the search, sometimes with his girlfriend, Rachel, and sometimes not.  The court therefore finds that DeAlba has standing to contest the search of the room in which he was staying on the date of his arrest.

/ / /

**B.     Ms. Robinette's Consent to the Officer's Entry and  Search.**

A warrantless search is unconstitutional unless the government demonstrates that it falls within certain well-established exceptions to the warrant clause. *See United States v. Brown,* 563 F.3d 410, 414 (9th Cir. 2009) (citing *United States v. Murphy,* 516 F.3d 1117, 1120 (9th Cir. 2008) (internal citation omitted)).  Consent is one such exception, and the Supreme Court has held that a warrantless search conducted pursuant to a valid consent is "constitutionally permissible." *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973).  It is the government's burden to demonstrate that consent was voluntary. *See United States v. Patayan Soriano,* 361 F.3d 494, 501 (9th Cir. 2004).  Whether consent to search was voluntary and intelligent is a question of fact, and its resolution depends upon the totality of the circumstances. *See United States v. Brown,* 563 U.S. 410, 415 (9th Cir. 2009) (citing *Schneckloth,* 412 U.S. at 227).

The Ninth Circuit considers the following factors in determining whether a person has voluntarily consented to a search: (1) whether the person consenting was in custody; (2) whether the officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the person consenting was told she had the right not to consent; and (5) whether the person consenting was told that a search warrant could be obtained. *United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009) (*citing United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002)).   When reviewing the surrounding circumstances, however, there is no "mechanized formula to resolve the voluntariness inquiry," and no one factor is dispositive. *Patayan,* 361 F.3d at 502.

DeAlba's motion argues that Ms. Robinette did not consent to the officers entry and that her written consent to search was not voluntary.  These arguments are based on information contained in the investigator's summary of an interview with Ms. Robinette attached as Exhibit "B" to the motion. However, Ms. Robinette did not testify to any of the information in the investigator's report used to support the arguments that her consent was involuntary.  Counsel for the Defendant initially rested without calling Ms. Robinette to the stand.  However, during oral argument, counsel for DeAlba requested to reopen the evidentiary hearing to call Ms. Robinette to the stand, specifically for the purpose of establishing DeAlba's standing to contest the search.  Neither counsel for DeAlba, nor counsel for the government asked Ms. Robinette any questions directed to the Ninth Circuit's five

factor test for determining whether she voluntarily consented to a search of her home.  Neither counsel showed Ms. Robinette the investigator's summary of the interview with her, or asked her whether the contents were accurate or inaccurate in any respect.

      The court finds that Ms. Robinette voluntarily consented to the officers entry into her home. The court found Officer Mangione's testimony credible that he requested that Ms. Robinette admit the officers to investigate a 911 disconnect.  It is undisputed that the officers used this ruse to gain entry. However, it is also undisputed that Ms. Robinette admitted the officers and answered their questions about who was in the home. Ms. Robinette told the officers that her son and son's girlfriend and small children were in the house. She pointed out the bedroom where DeAlba and his girlfriend were staying. At that point, Mangione told Ms. Robinette the real reason they were there was to arrest Rachel Loyd on outstanding warrants. The court found Officer Mangione credible that Ms. Robinette responded that she wanted Loyd out of her house. Ms. Robinette was not in custody when she admitted the officers. Nothing in the record suggests that the two officers involved had their weapons drawn at any point during the encounter. *Miranda* warnings were not administered to Ms. Robinette. She was not told that she had the right to refuse to consent before she admitted the officers, and was not told that a search warrant could be obtained if she refused to permit entry. Under the totality of the circumstances the court concludes her consent to the entry was voluntary.

      It is undisputed that Mrs. Robinette signed a written consent to search her home. It is also undisputed that DeAlba called out "mommy don't" or "mommy, don't do it" while Officer Mangione was requesting her written consent. It is undisputed that DeAlba's statement referred to Ms. Robinette's consent to search. Finally, it is undisputed that the officers did not ask DeAlba for his consent to search because Mangione believed DeAlba did not live in the residence and therefore lacked standing. Mangione could not recall whether DeAlba made the statement before or after Ms. Robinette actually signed the written consent. He testified that when he heard DeAlba make the statement Ms. Robinette looked at him and he told her to pay attention to him, not her son. Mangione could not recall whether he read the consent form verbatim to her before she signed. However, it is undisputed that Mangione specifically advised Ms. Robinette that he wanted permission to search the room in which DeAlba had been sleeping for firearms and that he explained to Ms. Robinette that she did not have to

11

consent and that it was her choice. The court found Officer Mangione's testimony in this regard credible.

At the time Ms. Robinette signed the consent to search she was talking with Mangione in the front yard of her house. Ms. Robinette had come out of the house to the front yard to watch what the officers were doing. Her movements in and out of the house had not been restricted in any way. Before asking for consent Mangione explained that her son was being arrested on outstanding felony warrants. Ms. Robinette was not in custody at the time she signed the written consent. There is no indication that the officers drew their weapons at any point during the entire encounter at the residence. Ms. Robinette was not given *Miranda* warnings before the consent to search was given. She was, however, told she had the right not to consent. She was not told that Mangione would obtain a search warrant if she refused to consent.

The written consent to search form was marked and admitted as Exhibit "1". It provides:

> I, HELEN ROBINETTE, having been informed of my right not to have a search made of the premises/property listed hereafter without a search warrant issued by a court of jurisdiction, and of my right to refuse to consent to a search for items directly or indirectly relating to the investigation of: EX-FELON IN POSSESSION OF FIREARM do hereby voluntarily consent to a search of Address/Description: 1515 Dawley, LV, NV 89101 for the following: FIREARMS.

It was signed by Ms. Robinette who provided her date of birth and printed her name below the signature line. The court finds under the totality of the circumstances that Ms. Robinette's written consent to search was voluntary.

       **C.**    **Mommy Don't Do It**.

The more difficult question is whether DeAlba's statement "mommy don't" or "mommy, don't do it" renders the search of the room with the written consent of Ms. Robinette a lawful search under the Fourth Amendment. DeAlba argues the United States Supreme Court's decision in *Georgia v. Randolph* compels suppression because DeAlba was a physically present co-occupant of the premises who objected to the search. The government responds that DeAlba was not asked to consent to a search

of the residence, and his consent was not necessary in the face of Ms. Robinette's consent, relying on the Ninth Circuit's decision in *United States v. Brown*.

Since at least 1974 the United States Supreme Court has held that a warrantless entry and search of premises with the voluntary consent of an occupant who shares, or is reasonably believed to share authority over the area in common with a co-tenant is constitutionally valid under the Fourth Amendment over the objections of an absent, co-occupant. *United States v. Matlock*, 415 U.S. 164, 170 (1974). In *Georgia v. Randolph*, the Supreme Court granted certiorari "to resolve a split of authority on whether one occupant may give law enforcement effective consent to search shared premises, as against a co-tenant who is present and states a refusal to permit the search." 546 U.S. at 108. In its decision the Supreme Court characterized the question before it as "whether a search with the consent of one co-tenant is good against another, standing at the door and expressly refusing consent." *Id*. at 119. It held that in the circumstances before it "a physically present co-occupant's stated refusal to prevent entry prevails, rendering the warrantless search unreasonable and invalid as to him." *Id*. at 106.

The *Randolph* decision made clear that the Supreme Court decided the case based on the specific facts of the case. There, the defendant Scott Randolph, was convicted of possession of cocaine. Evidence against him was obtained in a search of the marital residence pursuant to the wife's consent. On the date of the search officers went to the marital residence after receiving the wife's complaint that her husband had taken their son away. When the officers arrived at the home the wife told the officers that her husband was a cocaine user and that had caused financial troubles. She also told the officers that the couple had marital problems and she and their son had only recently returned after a stay of several weeks with her parents in Canada. The husband returned shortly after the officers arrived. The husband explained that he had taken the child to a neighbor's house out of concern that his wife might take him out of the country again. The husband denied cocaine use and accused the wife of abusing drugs and alcohol.

One of the officers went with the wife to find and reclaim the child. When they returned the wife renewed her complaints about her husband's drug use and volunteered that there were items of evidence in the house. The officer asked the husband for permission to search the house. The husband "unequivocally refused." After the husband refused the same officer asked the wife for her consent to

search, "which she readily gave." The wife led the officer upstairs to a bedroom she said belonged to her husband. The officer observed a drinking straw with a white powdery residue he suspected was cocaine. The officer left the house to get an evidence bag from his car and to call the District Attorney's Office. The District Attorney's Office instructed the officer to stop the search and apply for a warrant. When the officer returned to the house, the wife withdrew her consent. The police then took the straw and residue to the police station along with both Randolphs. A search warrant was obtained and the officers returned to the residence and found and seized additional evidence of drug use which was used to indict and convict the husband.

The Supreme Court's decision in *Randolph* acknowledged that all four Courts of Appeals to have considered the question had concluded that the consent of one occupant to search a shared premises was effective against a co-occupant who was present and refused to permit the search. See *United States v. Morning*, 64 F.3d 1531 (9th Cir. 1995); *United States v. Donlin*, 982 F.2d 31, 33 (1st Cir. 1992); *United States v. Hendrix*, 595 F.2d 883, 885 (D.C. Cir. 1979) (per curiam); *United States v. Sumlin*, 567 F.2d 684, 687-688 (6th Cir. 1977). *Randolph* abrogated all of these decisions. In doing so, the *Randolph* court recognized that none of its prior co-occupant consent to search cases had involved a physically present co-occupant who refused permission to search and later moved to suppress evidence. *Randolph* at 109. The Supreme Court did not overrule *Matlock*. The consent to search by one who possesses common authority over the premises is constitutionally valid over the objections of an absent, non-consenting person with whom an authority to the premises is shared. *United States v. Matlock*, 415 U.S. 164, 170 (1974). Rather, the Supreme Court examined the underpinnings of the co-occupant consent rule recognized in *Matlock* in analyzing why the facts in *Randolph* compelled a different conclusion.

Fourth Amendment rights are not limited by the law of property. *Randolph* at 110. Rather, the constitutional validity of third-party consent stems from the "mutual use of the property by persons generally having joint access or control for most purposes." *Id*. (Internal citations and quotations omitted). Under these circumstances, "it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id*. The Supreme Court explained that

the reasonableness of the third-party consent rule "is in significant part a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." *Id,*. at 111.

Citing its decision in *Minnesota v. Olsen*, that overnight guests have a legitimate expectation of privacy in their temporary quarters, the Supreme Court reasoned that "the co-inhabitant naturally has an even stronger claim." *Id*., at 113.  The Supreme Court observed that under general property law, normally each co-tenant has the right to use and enjoy the entire property as if he or she were the sole owner, limited only by the same right in the other co-tenants.  *Id*., at 114 (internal quotations and citations omitted).  Generally there is no societal understanding of a superior or inferior authority among disagreeing tenants.  *Id*.  Or as the Supreme Court summarized, "there is no common understanding that one co-tenant generally has a right or authority to prevail over the express wishes of another."  The Supreme Court recognized an exception to this common understanding where "the people living together fall within some recognized hierarchy, like a household of parent and child, or barracks housing military personnel of different grades." *Id*.

*Randolph* held "that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id*., at 120.  It was based on the specific facts of the case in which the husband was physically present in the marital residence, was asked to consent, and unequivocally refused.  The Supreme Court expressly left its holdings in *Matlock* and *Illinois v. Rodriguez*, 497 U.S. 177 (1990)[1] intact.  The decision acknowledged that if these two decisions were not to be undercut, the holding in *Randolph* was "drawing a fine line."  The Supreme Court described that fine line as follows: "if a potential defendant with self-interest in objecting is in fact at the door and

///

---

[1] In *Rodriquez*, the court found that an individual lacks common authority and may not consent to a search if that person occasionally spends the night at an apartment but does not entertain guests there, does not spend time in the apartment when the actual occupant is not present, does not contribute to the rent, and does not, to the knowledge of the occupant, possess a key.  *Id*., at 181.  The court found the search of the apartment was lawful under the doctrine of apparent authority, finding the police reasonably believed that person who provided consent was a co-tenant who had authority to consent.

objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby, but not invited to take part in the threshold colloquy, loses out." *Id*.

The fine lines are drawn in the trenches of the lower courts faced with deciding individual cases on the specific facts presented. *Randolph* offers little guidance to the specific facts before this court. This case involves the consent given by the mother of an adult child who had been "bouncing" between his mother's home and his sister's home for two weeks prior to the search. Ms. Robinette's testimony was that DeAlba would call first if he wanted to stay with her. At the time Ms. Robinette admitted the officers to her home, DeAlba was not present at the front door, but asleep in one of the bedrooms with his girlfriend. Unlike the husband in *Randolph* who was standing in the doorway of the marital residence, asked to consent to a search, and "unequivocally refused", DeAlba was not asked to consent. DeAlba followed the officers out after they arrested his girlfriend on outstanding warrants. When he continued to ask questions about his girlfriend's arrest, the officers asked him to identify himself and ran a records check. The records check indicated DeAlba had outstanding felony warrants, and DeAlba was placed under arrest outside the residence. Ms. Robinette was asked to consent to a search of her home while in her front yard as she was watching the arrest of her son and her son's girlfriend. Although DeAlba's motion to suppress argues that his statement "mommy, don't do it" constitutes an objection to the search, this court disagrees. DeAlba was clearly imploring his mother not to consent to the search. DeAlba did not tell the police they could not search the home or the room in which he was staying. Asking his mother not to consent suggests to the court that he understood it was her decision to make. The facts of this case are easily distinguishable from the facts in *Randolph*.

For the reasons stated, this court concludes that DeAlba "loses out."

**IT IS RECOMMENDED** that DeAlba's Motion to Suppress (Dkt. #44) be **DENIED**.

Dated this 12th day of April, 2013.

_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE